## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| **DAVID PULKRABEK, BARBARA RAINEY, ANDREW SCHWAB, WESLEY DICKMAN, and WHITNEY DICKMAN,** on their own behalf and on behalf of a class of similarly situated individuals, | |
| Plaintiffs, | |
| vs. | Case No.  2:20-cv-00036 |
| **TOYOTA MOTOR SALES, U.S.A., INC., TOYOTA MOTOR CORPORATION,** | DEMAND FOR JURY TRIAL |
| **and** | |
| **TOYOTA MOTOR NORTH AMERICA, INC.,** | |
| Defendants. | |

## PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT
## AND JURY TRIAL DEMAND

Plaintiffs David Pulkrabek, Barbara Rainey, Andrew Schwab, Wesley Dickman and Whitney Dickman, individually and on behalf of all others similarly situated, bring this action against Defendants Toyota Motor Sales, U.S.A., Inc., Toyota Motor Corporation, and Toyota Motor North America, Inc. ("Defendants" or "Toyota") by and through their attorneys and allege as follows:

### INTRODUCTION

1.     This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a class of current and former owners of model year 2019 and 2020 Toyota RAV4 Hybrid vehicles (hereinafter referred to collectively as the "Class Vehicles"). Defendants manufactured, distributed and sold the 2019 and 2020 Toyota RAV4 Hybrid vehicles, which are compact crossover SUVs.

2.      The Class Vehicles contain fuel tanks with a defect in the tank shape which does not allow the fuel tank to reach its advertised 14.5-gallon capacity.

3.      When an owner or lessee of a Class Vehicle attempts to refuel the Class Vehicle, the automatic fuel shut-off on the pump's handle kicks off before the fuel level reaches the tank's advertised 14.5-gallon capacity. Even when the tank is nearly empty, owners cannot add more than 10-11 gallons of fuel before the automatic shut-off engages and stops the pump from filling the tank further.

4.      This results in the Class Vehicles having an actual gas-tank capacity of less than 12 gallons of fuel—nearly 25 percent less fuel capacity than Toyota advertises (the "Defect").

5.      At all relevant times, Defendants knew, or through the exercise of reasonable care had reason to know, that the redesigned fuel tank was defective and that the actual capacity of the fuel tanks was substantially less than advertised.

6.      Defendants omitted and/or concealed the existence of the Defect to increase profits by selling additional Class Vehicles. Knowledge and information regarding the Defect were in the exclusive and superior possession of Defendants and its dealers, and this information was not provided to Plaintiffs and members of the Class.

7.      Based on pre-production testing, pre-sale durability testing, design failure mode analysis, bench testing, warranty and post-warranty claims, consumer complaints on forums monitored by Defendants, and consumer complaints made to and by dealers, and directly to Defendants, Defendants were aware of the Defect and omitted the existence of and/or fraudulently concealed the Defect from Plaintiffs and members of the Class.

8.      As a direct result of Defendants' wrongful conduct, Plaintiffs and members of the Class have been harmed and are entitled to actual damages, including damages for the benefit of

the bargain they struck when purchasing their vehicles, the diminished value of their vehicles, statutory damages, attorneys' fees, costs, restitution, and injunctive and declaratory relief.

9.      Specifically, Plaintiffs seek the following potential remedies: immediate installation of fuel tanks that do not suffer from the Defect; provision of a temporary replacement vehicle while repair of the Defect is pending; buyback of the Class Vehicles; compensation for any additional sums spent on any repairs to address the Defect; restitution for purchase of extended warranties that will go unused; compensation for the loss in value and depreciation of the Class Vehicles; and punitive or other damages for Defendants' knowing fraud.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 and jurisdiction over the Magnuson Moss Warranty Act claim by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

11.     Defendants are responsible for the manufacture, distribution, marketing, and sale of Toyota-brand vehicles in the United States.

12.     Defendants market their vehicles through online, radio, and TV advertisements as well as other popular media platforms throughout the United States.

13.     Defendants distribute and/or sell Toyotas through their nationwide network of dealerships, offices and facilities throughout the United States.

## PARTIES

**Plaintiffs**

14.     Plaintiffs David Pulkrabek and Barbara Rainey are married, citizens of the State of Missouri, and reside in Springfield, Missouri.

15.     Plaintiff Andrew Schwab is a citizen of the State of Missouri and resides in Springfield, Missouri.

16.     Plaintiffs Wesley Dickman and Whitney Dickman ("Plaintiffs Dickman") are married, citizens of the State of Missouri, and reside in Springfield, Missouri.

**Defendants**

17.     Defendants are automobile design, manufacturing, distribution, and/or service corporations doing business within the United States, and they design, develop, manufacture, distribute, market, sell, lease, warrant, service, and repair passenger vehicles, including Class Vehicles.

18.     Toyota Motor Sales, U.S.A., Inc. and Toyota Motor North America, Inc., are Texas corporations with their principal place of business at 6565 Headquarters Drive, Plano, TX 75024.

19.     Toyota Motor Corporation ("TMC") is a Japanese corporation, and the corporate parent of Toyota Motor North America, Inc. TMC, through its various subsidiaries and affiliates, designs, manufactures, markets, distributes and warrants Toyota automobiles throughout the fifty States.

20.     Defendant Toyota Motor North America, Inc. ("TMNA") is a California corporation headquartered in Plano, Texas as of May 2017. TMNA operates as a wholly owned subsidiary of Toyota Motor Corporation ("TMC"), the Japanese parent company, and is the

corporate parent of Toyota Motor Sales, U.S.A., Inc. ("TMS"). TMNA oversees government and regulatory affairs, energy, economic research, philanthropy, corporate advertising and corporate communications for all of TMC's North American operations.

21.     TMS is a California corporation headquartered in Plano, Texas. TMS is the U.S. sales and marketing division for TMC and TMNA, and it oversees sales and other operations across the United States. TMS distributes Toyota parts and vehicles, which are then sold through Defendants' network of dealers. Money received from the purchase of a Toyota vehicle from a dealership flows from the dealer to TMS.

22.     There exists, and at all times herein mentioned existed, a unity of ownership between TMC, TMNA, and TMS and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others. Adherence to the fiction of the separate existence of Defendants, would, under the circumstances set forth in this complaint, sanction fraud or promote injustice.

23.     For example, upon information and belief, Defendants TMNA and TMS communicate with TMC concerning virtually all aspects of the Toyota products TMNA and TMS distribute within the United States, including appropriate repairs for pervasive defects, and whether Toyota will cover repairs to parts customers claim to be defective. Toyota's decision not to disclose the Defect to Plaintiffs or the Class, or whether to cover repairs to the same pursuant to an extended warranty or goodwill program, was a decision made jointly by TMC, TMNA and TMS.

24.     TMS also oversees Toyota's National Warranty Operations (NWO), which, among other things, reviews and analyzes warranty data submitted by Toyota's dealerships and authorized technicians in order to identify defect trends in vehicles. Upon information and belief,

Toyota dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendants with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in the event Defendants decide to audit the dealership. NWO collects this information, makes it available to other Toyota divisions, and assists Toyota in determining whether particular repairs—such as those made to Plaintiffs' and the Class' fuel tanks—are covered by an applicable Toyota warranty or are indicative of a pervasive defect.

25.     Toyota also jointly designs, determines the substance of, and affixes to its vehicles the window stickers visible on each new Toyota vehicle that is offered for sale at its authorized dealerships, including those omitting mention of the Defect.  These stickers were reviewed by Plaintiffs and the Class prior to purchasing Class Vehicles. Toyota controls the content of these window stickers; its authorized dealerships have no input with respect to their content. Vehicle manufacturers like Toyota are legally required to affix a window sticker to every vehicle offered for sale in the United States pursuant to the Automobile Information Disclosure Act of 1958, 15 U.S.C. §§ 1231-1233, *et seq*. The Act specifically prohibits the removal or alteration of the sticker by anyone other than the ultimate purchaser prior to the sale of the car, including the dealership at which the vehicle is offered for sale.

26.     Toyota developed the marketing materials to which Plaintiffs and the Class were exposed, owner's manuals, informational brochures, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles, all of which fail to disclose the Defect.

27.     Toyota also employs a Customer Experience Center, the representatives of which are responsible for fielding customer complaints and monitoring customer complaints posted to

Toyota or third-party web sites: data which informs NWO's operations, and through which Toyota acquires knowledge of defect trends in its vehicles.

## TOLLING OF STATUTES OF LIMITATIONS

28.     Any applicable statute(s) of limitations have been tolled by Toyota's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and the members of the Class could not have reasonably discovered the true, latent nature of the Defect until shortly before this class action litigation was commenced.

29.     In addition, even after Plaintiffs and Class members contacted Toyota and/or its authorized dealers regarding the Defect, they were routinely informed that the Class Vehicles were not defective.

30.     Toyota was and remains under a continuing duty to disclose to Plaintiffs and the members of the Class the true character, quality, and nature of Class Vehicles, that the Defect is the result of poor manufacturing processes, workmanship and/or design, and that it will require costly repairs, and diminishes the resale value of the Class Vehicles. As a result of Toyota's active concealment, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

**The Defect**

31.     The 2019 and 2020 RAV4 Hybrid utilize a Dynamic Force 2.5-liter inline four-cylinder engine and dual electric motors with an Electronically Controlled Continuously Variable Transmission.

32.     For the 2019 and 2020 version of the Class Vehicles, Toyota redesigned the gas tank from a "Native American papoose" shape to a "latitudinal, saddle-shape design" to accommodate the location of the electric motor's battery.

33.     Toyota expressly represents that the RAV4 Hybrid has a 14.5-gallon gas tank.[1]

| Fuel tank capacity (Reference) | 14.5 gal. (55 L, 12.1 Imp.gal.) |
| --- | --- |

34.     Defendants further represented the RAV4 Hybrid to have an average 41/38/40 mpg rating (city/highway/combined).

35.     Toyota made these representations on its website, on the Class Vehicles' window stickers, in its Owner's Manuals for the RAV4 Hybrid, and in the warranty and maintenance brochure for the Class Vehicles.

36.     Based on these representations, the RAV4 Hybrid should have a driving range between 551 and 594 miles on a full tank.

37.     Driving range was a significant factor in Plaintiffs' and class members' initial purchase decisions.

38.     Toyota recognizes that consumers will pay a premium for hybrid and electric vehicles that are energy efficient and produce low emissions such as the RAV4 Hybrid and which have an acceptable driving range.

39.     Toyota has capitalized on this through its targeted and increased advertisements for its hybrid and electric vehicles such as the RAV4 Hybrid.  In its RAV4 Hybrid eBrochure, Toyota prominently represents that the hybrid model provides more horsepower and gets 10

---

[1] *Toyota 2019 RAV4 HV Owner's Manual* (2019).

miles per gallon more than the gas only models next to the slogan "Go farther. Go faster."[2]:



40.    The eBrochure makes clear that Toyota is highlighting the benefits of the RAV4 Hybrid over its gas-only version.

41.    As a result of the superior efficiency and driving range Toyota claims the RAV4 Hybrid has over the gas-only version, Toyota's MSRP for the RAV4 Hybrid is nearly $2000 higher than the gas-only version.

42.    Based on Toyota's representations, the RAV4 Hybrid should be able to travel on average nearly 145 more miles per tank of gas than the gas-only versions.

[2] *MY19 RAV4 GAS/HYBRID eBrochure*, p.5, https://www.toyota.com/rav4/ebrochure/ (last visited Jan. 30, 2020).

43.     Toyota's Owner's Manual for the RAV4 Hybrid instructs owners to refuel the Class Vehicle when the Low Fuel Level Warning Light appears. The manual indicates this light will come on when there are approximately 2.2 gallons of fuel remaining in the 14.5-gallon fuel tank.

44.     However, the re-designed fuel tank contains a Defect which does not allow the fuel level to reach the advertised 14.5-gallon capacity. Instead, when an owner of a RAV4 Hybrid refuels the Class Vehicle, the automatic fuel shut-off on the pump's handle kicks off well before the tank reaches 14.5 gallons.

45.     Even when the tank is nearly empty, owners cannot add more than 10-11 gallons of fuel before the automatic shut-off engages and stops the pump from filling the tank further.

46.     This results in the RAV4 Hybrid having an actual gas-tank capacity of less than 12 gallons of fuel—***nearly 25 percent less fuel capacity than Toyota advertises for the Class Vehicles***.

47.     As a result of the significantly reduced fuel capacity created by the Defect in the RAV4 Hybrid's fuel tank, Toyota's representations as to the Class Vehicles' 14.5-gallon fuel tank are false, misleading, and fraudulent.

48.     The defect causes the affected vehicles to have a markedly lower driving range than designed.

49.     Upon information and belief, the Defect is present in every 2019 and 2020 RAV4 Hybrid sold in the United States.

50.     The Defect causes the 2019 and 2020 RAV4 Hybrid to suffer a diminished value in that the Class Vehicle:

   a.   Does not have the fuel capacity represented by Toyota;

    b.   Has a lower fuel capacity than gas-only models;

    c.   Has a lower driving range than represented by Toyota;

    d.   Forces owners to make more frequent trips to the fuel pump and expend more time engaged in this activity; and

    e.   Forces owners to cycle the starting components more frequently during increased fill ups.

51.    The fuel tank capacity and driving range of a vehicle are material facts that consumers rely on when deciding whether to purchase a vehicle.

52.    Had Toyota disclosed the existence of the Defect, Plaintiffs and the Class would not have purchased their Class Vehicles, or would have paid substantially less for them.

53.    Additionally, the Defect creates environmental hazards when drivers, misled by Toyota as to the actual fuel capacity of their vehicles, attempt to top-off the fuel tank after the fuel pump's automatic shut-off has triggered seemingly prematurely. Topping off a fuel tank is likely to result in fuel spills; a hazard Toyota recognizes and warns against in its Owner's Manual.

**Toyota's Warranty-Related Practices**

54.    In its New Vehicle Limited Warranty, Toyota agrees to repair defects reported within the earlier of three years or 36,000 miles, so long as the vehicle owner tenders the vehicle to a Toyota authorized dealer for repair. The Warranty Information Booklet included with all Class Vehicles provides that:

> This warranty covers repairs and adjustments needed to correct
> defects in materials or workmanship of any part supplied by Toyota…
> Coverage is for 36 months or 36,000 miles, whichever occurs first…

55.    Further, Toyota maintains a Federal Emission Control Warranty wherein Defendants represent the RAV4 Hybrid was "designed, built and equipped to conform at the time

of sale with applicable federal emissions standards", that the Class Vehicle is "free from defects in materials and workmanship that may cause the vehicle to fail to meet these standards", and that "[f]ederal regulations require that this warranty be in effect for two years or 24,000 miles from the vehicle's in-service date, whichever occurs first" but "under the terms of the Basic Warranty, Toyota provides coverage of three years or 36,000 miles, whichever occurs first."

56.     The Federal Emissions Control Warranty covers the fuel tank for the RAV4 Hybrid.

57.     Toyota evades its warranty obligations by claiming that the Defect is not a defect at all, but a normal operating condition, and declines any warranty coverage to bring the Class Vehicles in line with Toyota's representations regarding the fuel tank capacity.

**Toyota's Knowledge of the Defect**

58.     Upon information and belief, Toyota had knowledge of the Defect prior to the 2019 and 2020 RAV4 Hybrid's release.

59.     Manufactures such as Toyota perform rigorous product testing prior to releasing their vehicles to confirm, among other things, the vehicle's compliance with specification representations and marketing materials Toyota intends to provide to the public, as well as compliance with state and federal regulations.

60.     On information and belief, such product testing would include testing to determine the actual fuel capacity of the 2019 and 2020 RAV4 Hybrid when utilizing a commonly used gas pump with an automatic shutoff nozzle.

61.     As a result, Toyota was well aware of the defect described herein, yet continued to make its false and misleading statements regarding the Class Vehicle's fuel capacity.

62.     In November of 2019, Toyota provided a Tech Tip to its authorized dealers and repair shops regarding this problem with the 2019 RAV4 Hybrid fuel system.

63.     However, in the Tech Tip, Toyota characterized the issue as a fuel gauge concern "related to fuel gauge reading less than full."

64.     Toyota's repair technicians were advised to test the fuel gauge.

65.     However, if the fuel gauge was operational, Toyota directed its technicians to advise that no further repairs were recommended and that the concern is under investigation.

66.     KDFW, a Fox TV affiliate in the Dallas/Ft. Worth area conducted a consumer investigation and publicly reported, "On Toyota message boards there are hundreds of complaints from consumers, and the National Highway Traffic Safety Administration listed more than 100 fuel tank related complaints about the RAV4 Hybrid at the time of this report all making the same claim that the gas tank on the redesigned 2019 RAV4 hybrid just won't fill. Drivers say that means more trips to the gas station and shorter driving distance range on a full tank despite Toyota's ads for the car which say just the opposite."[3]

67.     In that same article, KDFW interviewed Toyota and reported, "When we asked Toyota about the problem, they acknowledged the issue in the following statement: "As part of our commitment to quality and customer satisfaction, Toyota monitors available information in the field and takes appropriate action to help address issues when they arise. Toyota is currently investigating a potential fuel tank shape issue on certain RAV4 Hybrid vehicles. Based on our ongoing investigation, we believe variations in fuel tank shape may prevent a full refill by up to several gallons, potentially impacting the vehicle's total available driving distance. As a best

---

[3]https://www.fox4news.com/news/consumer-alert-gas-tank-design-flaw (Last visited February 13, 2020).

practice, customers should refuel before or when the low fuel light illuminates, to prevent running out of fuel."

68.     Plano-based Toyota acknowledged to KDFW that it is aware of the problem and is investigating but would not talk to a reporter on camera or address why it is continuing to sell 2019 and 2010 RAV4 Hybrids without proactively disclosing all of the information to potential buyers.

69.     After KDFW's investigative report, Toyota began offering what it is calling an interim fix until a final remedy is identified.

70.     According to Toyota, when the company reshaped the RAV4 Hybrid gas tank starting in the 2019 model year, that new shape "may prevent a full refill by up to several gallons, potentially impacting the vehicle's total available driving distance."

71.     KDFW reported that "Hundreds of owners FOX 4 spoke to from across the country said they bought the hybrid because it was supposed to mean fewer trips to the gas station and longer driving distances on a full tank. But that hasn't been their experience."

72.     Toyota acknowledges that its "interim fix" "may not prevent the condition from reoccurring."

73.     In a full statement from Toyota of North America, Toyota stated in part: "Until a final remedy is identified, the interim option is to install a replacement tank. Based on our ongoing investigation, replacing the fuel tank may mitigate these concerns, although it may not prevent the condition from reoccurring."

**Plaintiffs David Pulkrabek and Barbara Rainey**

74.      In August of 2019, Plaintiffs David Pulkrabek and Barbara Rainey saw an online advertisement for a 2019 RAV4 Hybrid listed for sale at Fowler Automotive, located in Tulsa, Oklahoma. Plaintiff Pulkrabek called the dealership from his home in Missouri and negotiated the sales price and trade-in value the dealership would give for Plaintiffs' old vehicle.

75.      Once the deal was complete, Plaintiffs Pulkrabek and Rainey traveled to the dealership to pick up their 2019 RAV4 Hybrid. Plaintiffs purchased the Class Vehicle and drove it back to their home in Springfield, Missouri.

76.      Plaintiffs Pulkrabek and Rainey purchased (and still own) this vehicle, which is used for personal, family and/or household uses. Their vehicle bears Vehicle Identification Number JTMEWRFV1KD511045.

77.      On multiple occasions while refueling their Vehicle, Plaintiffs observed that the tank would not take a full 14.5 gallons before the pump's automatic shutoff would engage. Plaintiffs would attempt to top-off the fuel, but were never able to get a full 14.5 gallons of gas in the tank.

78.      Rather, the most Plaintiffs could fill a nearly empty tank was approximately 11 gallons of gas, thereby reducing their driving range from that promised by Toyota.  If the vehicle was filled to the advertised capacity, then it could attain a theoretical maximum range of 594.5 to 551 miles (Toyota represents the vehicle MPG as 41 city/ 38 highway).  Instead, the range is actually between 451 and 418 miles based upon Toyota's represented MPG.  This represents an almost 25% reduction from what Plaintiffs and the Class were promised.

79.     This caused Plaintiffs to make more trips to refuel their Class Vehicle than they should have been required to do based on Toyota's misrepresentation that their Class Vehicle's fuel tank could hold 14.5 gallons of fuel.

80.     Plaintiffs took the Class Vehicle to Reliable Toyota in Springfield, Missouri, an authorized Toyota dealership, to address this issue on three occasions. The dealership replaced multiple components on the Class Vehicle and represented that it had addressed the fuel tank issue.

81.     After the third trip to the dealership's shop, Plaintiffs traveled across the street to refuel their Class Vehicle. Plaintiffs were still unable to fill the tank to 14.5 gallons before the pump nozzle clicked off.

82.     Plaintiff Pulrabek then called Toyota's customer service line and informed Toyota of the issue. Toyota represented they would investigate a potential lemon law claim based on Plaintiffs' complaint.

83.     On January 16, 2020, Toyota responded with a letter to Plaintiff Pulrabek wherein Toyota stated "we have determined that the concern that you reported is a normal operating characteristic of the vehicle. Therefore, we cannot offer you any assistance at this time."

84.     As a result of the fuel tank Defect and Toyota's refusal to comply with its warranties, Plaintiffs Pulrabek and Rainey have suffered actual damages in the form of the diminished value of their 2019 RAV4 Hybrid.

85.     Plaintiffs Pulrabek and Rainey have suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the fuel tank Defect, including, but not limited to, more frequent fueling, out of pocket loss associated with the fuel tank Defect,

future attempted repairs, and diminished value of their vehicle.

86.     Neither Defendant, nor its agents, dealers or other representatives informed Plaintiffs of the existence of the fuel tank Defect prior to purchase.

87.     Plaintiffs would not have purchased the Class Vehicle, or would have paid substantially less for it, had Defendant disclosed the Defect prior to sale.

**Plaintiff Andrew Schwab**

88.     On October 27, 2019, Plaintiff Andrew Schwab purchased his 2019 Toyota RAV4 Hybrid from Reliable Toyota in Springfield, Missouri.

89.     Plaintiff purchased (and still owns) this vehicle, which is used for personal, family and/or household uses. His vehicle bears Vehicle Identification Number JTMMWRFVXKD025474.

90.     Plaintiff Schwab purchased his Class Vehicle in part because of the long distances he expected to be able to travel on a single tank of fuel.

91.     However, Plaintiff Schwab did not get the expected fuel range out of his Vehicle and was forced to make more frequent fuel stops than expected.

92.     On multiple occasions while refueling his Vehicle, Plaintiff observed that the tank would not take a full 14.5 gallons before the pump's automatic shut off would engage. Plaintiff would attempt to top-off the fuel, but was never able to get a full 14.5 gallons of gas in the tank.

93.     Rather, the most Plaintiff could fill a nearly empty tank was approximately 11 gallons of gas, thereby reducing his driving range from that promised by Toyota.  If the vehicle was filled to the advertised capacity then it could attain a theoretical maximum range of 594.5 to 551 miles (Toyota represents the vehicle MPG as 41 city/ 38 highway).  Instead, the range is

actually between 451 to 418 miles based upon Toyota's represented MPG.  This represents an almost 25% reduction from what Plaintiff and the Class were promised.

94.     This caused Plaintiff to make more trips to refuel his Class Vehicle than he should have been required to do based on Toyota's misrepresentation that his Class Vehicle's fuel tank could hold 14.5 gallons of fuel.

95.     A representative from Toyota called Plaintiff Schwab after he had the Class Vehicle for a few weeks to ask him about his experience with the Class Vehicle.

96.     Plaintiff Schwab informed the Toyota representative about the fuel tank issue.

97.     The Toyota representative did not offer any explanation or advise Plaintiff Schwab of anything that could be done to fix the issue.

98.     Instead, the Toyota representative told Plaintiff Schwab he would get back to him about the fuel tank issue.

99.     No one from Toyota has since called Plaintiff Schwab to address the fuel tank issue.

100.     As a result of the fuel tank Defect and Toyota's refusal to comply with its warranties, Plaintiff has suffered actual damages in the form of the diminished value of his 2019 RAV4 Hybrid.

101.     Plaintiff Schwab has suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the fuel tank Defect, including, but not limited to, more frequent fueling, out of pocket loss associated with the fuel tank Defect, future attempted repairs, and diminished value of his vehicle.

102.     Neither Defendant, nor its agents, dealers or other representatives informed

Plaintiff of the existence of the fuel tank Defect prior to purchase.

103.     Plaintiff would not have purchased the Class Vehicle, or would have paid substantially less for it, had Defendant disclosed the Defect prior to sale.

**Plaintiffs Wesley and Whitney Dickman**

104.     On November 14, 2019, Plaintiffs Wesley and Whitney Dickman purchased their 2019 Toyota RAV4 Hybrid from Reliable Toyota in Springfield, Missouri.

105.     Plaintiffs purchased (and still own) this vehicle, which is used for personal, family and/or household uses. Their vehicle bears Vehicle Identification Number JTMDWRFVXKD519348.

106.     Plaintiffs Dickman purchased the Class Vehicle in part because of the long distances they expected to be able to travel on a single tank of fuel.

107.     However, Plaintiffs Dickman did not get the expected fuel range out of their Vehicle and were forced to make more frequent fuel stops than expected.

108.     On multiple occasions while filling up their Vehicle, Plaintiffs observed that the tank would not take a full 14.5 gallons before the pump's automatic shut off would engage. Plaintiffs would attempt to top-off the fuel, but were never able to get a full 14.5 gallons of gas in the tank.

109.     Rather, the most Plaintiffs could fill a nearly empty tank was approximately 11 gallons of gas, thereby reducing their driving range from that promised by Toyota.  If the vehicle was filled to the advertised capacity then it could attain a theoretical maximum range of 594.5 to 551 miles (Toyota represents the vehicle MPG as 41 city/ 38 highway).  Instead, the range is

actually between 451 to 418 miles based upon Toyota's represented MPG.  This represents an almost 25% reduction from what Plaintiffs and the Class were promised.

110.    This caused Plaintiffs to make more trips to refuel their Class Vehicle than they should have been required to do based on Toyota's misrepresentation that their Class Vehicle's fuel tank could hold 14.5 gallons of fuel.

111.    Plaintiffs Dickman took their Class Vehicle into Reliable Toyota for a 5,000-mile service.

112.    At that time, Plaintiff Whitney Dickman reported the fuel tank issue to a Toyota representative.

113.    The Toyota representative said that the tank never fills up because the fuel lines are submerged in the tank and it doesn't register the 3-4 gallons in the fuel line.

114.    The Toyota representative indicated that when the fuel gauge shows the Class Vehicle is near empty, there are actually 3-4 gallons in the fuel line that are not registering on the gauge.

115.    Toyota did not offer to repair the issue and did not suggest any fix was being investigated. As a result of the fuel tank Defect and Toyota's refusal to comply with its warranties, Plaintiffs have suffered actual damages in the form of the diminished value of their 2019 RAV4 Hybrid.

116.    Plaintiffs Dickman have suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the fuel tank Defect, including, but not limited to, more frequent fueling, out of pocket loss associated with the fuel tank Defect, future attempted repairs, and diminished value of their vehicle.

117.    Neither Defendant, nor its agents, dealers or other representatives informed

Plaintiffs of the existence of the fuel tank Defect prior to purchase.

118.     Plaintiffs would not have purchased the Class Vehicle, or would have paid

substantially less for it, had Defendant disclosed the Defect prior to sale.

## CLASS ACTION ALLEGATIONS

119.     Plaintiffs bring this action on their own behalf, and on behalf of a nationwide

class pursuant to Rules 23(a), 23(b)(2), and/or 23(b)(3) of the Federal Rules of Civil Procedure.

> **Nationwide Class**:
> All persons or entities in the United States who are current or former owners
> and/or lessees of a Class Vehicle

120.     Pursuant to Fed. R. Civ. P. 23(c)(5), Plaintiffs also seek to represent the following

State Subclass:

> **Missouri Class**:
> All individuals who purchased or leased a Class Vehicle for personal or household
> use in Missouri.

121.     Excluded from the proposed class are Defendants; any affiliate, parent, or

subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer,

director, or employee of Defendants; any successor or assign of Defendants; and any judge to

whom this case is assigned and any member of his or her immediate family.

122.     <u>Numerosity</u>. Upon information and belief, the Class is so numerous that joinder of

all members is impracticable. Although the exact number and identities of individual members of

the Class are unknown at this time, such information being in the sole possession of Toyota and

obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis

allege, Defendants sold over 90,000 2019 and 2020 RAV4 Hybrids. As a result, there are far too

many class members to be practically joined in a single action.

123.   <u>Existence and predominance of common questions</u>.  Common questions of law and fact exist as to all members of the proposed class and predominate over questions affecting only individual class members.  These common questions include:

    a.   Whether the Class Vehicles were materially defective when sold;

    b.   Whether Defendants concealed the material defect in the Class Vehicles;

    c.   Whether Defendants had a duty to disclose the material defects in the Class Vehicles;

    d.   Whether Defendants' marketing of the Class Vehicles was likely to deceive or mislead consumers;

    e.   Whether Defendants' conduct violates any applicable warranties;

    f.   Whether Plaintiffs and class members were injured as a direct result of Defendants' conduct;

    g.   Whether the parties and class members are entitled to rescission of contract based upon mistake of fact;

    h.   Whether Defendants violated the Missouri Merchandising Practices Act;

    i.   Whether Defendants engaged in fraud;

    j.   Whether equitable tolling applies to the statues of limitation; and

    k.   Whether Defendants had a duty to disclose the existence of the defect in the Class Vehicles to their customers.

124.   <u>Typicality</u>.  Plaintiffs' claims are typical of the claims of the proposed classes. Plaintiffs and the class members they propose to represent purchased the defective 2019 and 2020 RAV4 Hybrids, all of which contained the same Defect, Plaintiffs and the putative class

suffered the same or similar damages, and Defendants' conduct gives rise to the same or similar claims for Plaintiffs and putative class members.

125.    <u>Superiority</u>. The action may be certified under Rule 23(b)(3) because common questions predominate as described above and because a class action is the best available method for the fair and efficient adjudication of this controversy. This litigation involves technical issues that will require expert testimony and targeted discovery of sophisticated defendants, and could not practically be taken on by individual litigants. In addition, individual litigation of class members' claims would be impracticable and unduly burdensome to the court system and has the potential to lead to inconsistent results. A class action presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

126.    In the alternative to class certification under Rule 23(b)(3), the proposed classes may be certified under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory appropriate with respect to the class as a whole.

## <u>COUNT I</u>

### VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. §§ 2301 *et seq.*)
### (Nationwide Class)

127.    Plaintiffs incorporate the preceding paragraphs as if set out fully herein.

128.    Plaintiffs bring this class on their own behalf and on behalf of a Nationwide Class, as defined above, against Defendants.

129.    The Class Vehicles are "consumer product[s]" under 15 U.S.C. § 2301(1).

130.    Plaintiffs and members of the putative class are "consumers" under 15 U.S.C. § 2301(3).

131.    Defendants are "suppliers" and "warrantors" within the meaning of 15 U.S.C. § 2301(4)-(5).

132.    Defendants provided purchasers of the Class Vehicles with a written warranty as defined by 15 U.S.C. § 2301(6).

133.    Defendants sold the Class Vehicles with the written warranty described above.

134.    Defendants breached this warranty by selling the Class Vehicles with defects and other deficiencies described more fully above.

135.    As Defendants have represented, this defect cannot be repaired.

136.    Defendants' breach of warranty has deprived Plaintiffs and Class members of the benefit of their bargain. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

137.    Defendants had an opportunity to disclose information concerning the Class Vehicle's inability to perform as warranted, and to cure its breach of warranties.  Defendants have failed to do so.  Contemporaneously with the filing of this complaint, Plaintiffs are making further demand of Defendants—in writing and on behalf of the proposed class—to comply with its warranty obligations and is offering to participate in an informal dispute settlement procedure.

138.    As a direct and proximate result of Defendants' conduct, Plaintiffs and other members of the Nationwide Class have suffered damages and continue to suffer damages, including economic damages at the point of sale, that is, the difference between the value of the

Class Vehicles as promised and the value of the Class Vehicles as delivered. Plaintiffs and members of the Nationwide Class are entitled to legal and equitable relief against Defendants, including damages, specific performance, attorney fees, costs, and other relief as appropriate.

## COUNT II

### COMMON LAW FRAUD
### (Nationwide Class or, alternatively, Missouri Class)

139.    Plaintiffs incorporate the preceding paragraphs by reference as if set out fully herein.

140.    Plaintiffs bring this claim on behalf of themselves and a proposed Nationwide Class against Defendants.

141.    As set forth above, since at least January of 2019, Defendants made representations as set out above that the Class Vehicles had a fuel tank capacity of 14.5 gallons.

142.    Defendants made these representations, *inter alia*, in their product brochures, website, advertising materials, specifications, and in the Owner's Manual they provided to their customers.  The representations regarding the fuel tank capacity were false.

143.    Defendants made these false representations for the purpose of driving sales to consumers.

144.    Defendants knew that their representations were false, or acted in deliberate ignorance and/or with reckless disregard of the truth of their representations.

145.    Defendants knew that the Class Vehicles suffered the same fuel tank Defect.

146.    Even though Defendants knew of this Defect, they failed to disclose the Defect to its customers at the point of sale and continued to make the false representations described herein to drive sales.

147.     Defendants had a duty to disclose these material facts because they had exclusive knowledge of the material facts described above and such facts were not known or reasonably knowable by the Plaintiffs and putative class; because Toyota actively concealed these material facts from Plaintiffs and the putative class; and because it made representations regarding the Class Vehicles specifications to federal agencies.

148.     Defendants actively concealed or suppressed these material facts at least since 2019, in order to profit from the sale of the Class Vehicles and to defraud Plaintiffs and class members.

149.     From the release of the 2019 model year to present, consumers paid hundreds of millions of dollars for Defendants' defective RAV4 Hybrid due to Defendants' false statements and omissions concerning the Class Vehicles' ability to perform as promised.

150.     Plaintiffs and the proposed nationwide class had no knowledge of, and had no reason to know, at the time of purchase that Defendants had concealed or suppressed these material facts and/or had misrepresented the fuel tank capacity of the Class Vehicles.

151.     As a result of Defendants' fraud, Plaintiffs and proposed nationwide class members have suffered diminished value of their 2019 and 2020 RAV4 Hybrids.

152.     Because Defendants' conduct was wanton, deliberate, oppressive and malicious, or in reckless disregard of Plaintiffs' and class members' rights, Plaintiffs and the proposed nationwide class are entitled to an award of punitive or exemplary damages in an amount to be determined at trial.

**COUNT III**

**UNJUST ENRICHMENT**
**(Nationwide Class or, alternatively, Missouri Class)**

153.     Plaintiffs incorporate the preceding paragraphs as if set out fully herein.

154.     From the release of model year 2019 to present, consumers paid hundreds of millions of dollars for Defendant's defective 2019 and 2020 RAV4 Hybrid due to Defendants' false statements and omissions concerning the Class Vehicle's fuel tank capacity.

155.     Plaintiffs and class members are entitled to the return of all payments by them for the defective Vehicles due to the false statements and omissions by the Defendants.

156.     By reason of the above-described payments, Defendants have received money, directly or indirectly, to which they were not entitled, as the expense of the Plaintiffs and class members.  Defendants therefore have been unjustly enriched in an amount to be established at trial.

**COUNT IV**

**MISSOURI MERCHANDISING PRACTICES ACT**
**(Missouri Class)**

157.     Plaintiffs incorporate the preceding paragraphs as if set out fully herein.

158.     Plaintiffs bring this count on their own behalf and on behalf of the Missouri Class pursuant to 407.025.2 RSMo.

159.     Defendants advertised that the 2019 and 2020 RAV4 Hybrid had a 14.5-gallon fuel tank and that the Hybrid would "[g]o farther" than the gas-only version.

160.     In fact, however, and as Defendant knew or should have known, the RAV4 Hybrid's fuel tank would not accept 14.5 gallons of fuel before triggering a fuel pump's nozzle to

automatically shut off.  The fuel tank would only accept 10 to 11 gallons of fuel at most when being filled from empty, resulting in a shorter driving range than expected.

161.    Defendants' representations regarding the 2019 and 2020 RAV4 Hybrid's fuel capacity were, therefore, false and made knowingly, or without knowledge as to its truth or falsity, by Defendants and were therefore deception, fraud, false pretense, false promise, and misrepresentation as described in § 407.020, RSMo., and constitute a violation of that statute, which prohibits such practices.

162.    Pleading alternatively, Defendants' representation that the Class Vehicles had a 14.5-gallon fuel tank and that it could "[g]o farther" than the gas-only version constituted the omission or suppression of a material fact in violation of the provisions of § 407.020, RSMo. in that it was known the Class Vehicles' gas tank could not be refueled with 14.5 gallons of fuel at a given time, as set out above, and further that testing showed this Defect in the product before it was sold to consumers.

163.    Defendant's representation regarding the Class Vehicles' fuel capacity was material to Plaintiffs' and proposed class members' decisions to purchase the Vehicle.

164.    Plaintiffs and class members relied on Defendants' representations to their detriment by purchasing the defective Class Vehicles.

165.    Plaintiffs and class members purchased the Class Vehicles for personal or household use in Missouri.

166.    Proposed class members also relied on Defendants' representations to their detriment and suffered similar damages as those of Plaintiffs.

167.    Defendants knew or should have known their statements were false and misleading and would deceive consumers, including Plaintiffs and the Missouri Class.

168.     Plaintiffs and Missouri Class members suffered ascertainable loss and injury-in-fact, including the loss of money and property, as a result of Defendants' misrepresentations and omissions, which are unfair, deceptive, untrue, or misleading in violation of the MMPA.

169.     Plaintiffs and the Missouri Class would not have purchased the Class Vehicles had they known of the deceptive nature of Defendants' misrepresentations and omissions, or they would have paid less for the Class Vehicles.

170.     Plaintiffs and the proposed class have suffered diminution in the performance of their Class Vehicles vis-à-vis advertised performance.

171.     Defendants' conduct was intentional, wrongful, and malicious and entitled Plaintiffs and proposed class members to the recovery of punitive damages as authorized by statute at § 407.025.1, RSMo.

172.     Plaintiffs are entitled to recover his attorney's fees and costs pursuant to statute.

## <u>COUNT V</u>

### BREACH OF EXPRESS WARRANTY
### (Nationwide Class or, alternatively, Missouri Class)

173.     Plaintiffs incorporate the preceding paragraphs as if set out fully herein.

174.     Plaintiffs bring this claim on their own behalf and on behalf of the Nationwide Class.

175.     Alternatively, Plaintiffs bring this claim on behalf of the Missouri Class.

176.     Defendants provided Plaintiffs and class members with the express warranties set out above.

177.     Specifically, Defendants warranted that the Class Vehicles had been manufactured in a workmanlike manner and were free of any material defects; and that in the event the Class

Vehicles suffered from defects in either of these respects, Defendants would correct such defects at no cost to Plaintiffs or class members.

178.    The Class Vehicles were not manufactured in a workmanlike manner and/or suffered from material defects as set out above.

179.    Defendants have refused to and continue to refuse to comply with the terms of their warranty to correct the defects outlined above.

180.    The express warranty was in effect at all times relevant herein.

181.    As a result, Plaintiffs and class members have suffered damages.

182.    Defendants' conduct was done knowingly, wantonly, maliciously and/or in conscious disregard for the rights of Plaintiffs and the class, justifying the imposition of punitive damages.

## COUNT VI

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(Nationwide Class or, alternatively, the Missouri Class)**

183.    Plaintiffs incorporate the preceding paragraphs as if set out fully herein.

184.    Plaintiffs bring this claim on their own behalf and on behalf of the Nationwide Class.

185.    Alternatively, Plaintiffs bring this claim on behalf of the Missouri Class.

186.    Plaintiffs and class members purchased new Class Vehicles from Defendants.

187.    Those new cars carried with them an implied warranty of merchantability.

188.    The 2019 and 2020 RAV4 Hybrids were not merchantable as set out above in that the Class Vehicles:

    a.  Could not pass without objection in the trade under the contract description;

    b.  Were not fit for the ordinary purposes for which they were used;

c.   Were not adequately contained, packaged, and labeled; and

d.   Did not conform to the promises or affirmations of fact made on the container or label.

189.   Defendants' conduct deprived Plaintiffs and the proposed class of the benefit of their bargain in that they paid more than the Class Vehicles were worth in their actual condition.

190.   As a direct and proximate result of Defendants' breach of their duties, Plaintiffs and proposed class members received goods whose condition substantially impairs their value. Plaintiffs and the proposed class have been damaged by the diminished value of the Class Vehicles.

191.   Plaintiffs and class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described above.

192.   Defendants' conduct was intentional, wrongful, and malicious and entitles Plaintiffs and proposed class members to the recovery of punitive damages.

**WHEREFORE**, Plaintiffs and class members pray this Court enter judgment against Defendants for their damages, for punitive damages, for their costs incurred herein and for such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

By    /s/ Bonner C. Walsh                    
         Bonner C. Walsh
         Texas Bar No 24051766
         **WALSH PLLC**
         1561 Long Haul Road

Grangeville, ID 83530
Telephone: (541) 359-2827
Facsimile: (866) 503-8206
bonner@walshpllc.com

Charles Everingham IV
Texas Bar No. 00787447
Claire Henry
Texas Bar No. 24053063
**WARD, SMITH & HILL, PLLC**
P.O. Box 1231
Longview, TX 75606
903-757-6400
903-757-2323 (Facsimile)
ce@wsfirm.com
claire@wsfirm.com

Craig R. Heidemann
Missouri Bar No. 69582
Nickolas W. Allen
Missouri Bar No. 69582
**DOUGLAS, HAUN & HEIDEMANN, P.C.**
103 East Broadway, P.O. Box 117
Bolivar, Missouri 65613
Telephone: (417) 326-5261
Facsimile: (417) 326-2845
craig@dhhlawfirm.com
nick@dhhlawfirm.com

Matthew D. Schelkopf
**Sauder Schelkopf LLC**
555 Lancaster Ave.
Berwyn, PA 19312
(T): (610) 200-0581
(F): (610) 421-1326
mds@sstriallawyers.com